UNITED STATES of America

v.

**Harry K. KAHALE, Harold Richard Graham, Gregory C. Scarlato, and Mitchell Reisman, Defendants.**

No. 09–cr–159 (KAM).

United States District Court,
E.D. New York.

Dec. 23, 2009.

Jonathan E. Green, Tanya Yvette Hill, United States Attorneys Office, Brooklyn, NY, for United States of America.

MEMORANDUM & ORDER

MATSUMOTO, District Judge:

**Contents:**

**Introduction** .................................................365

**Background**...................................................367

**Discussion** ..................................................370

 I. Requests for Bills of Particulars ....................................370

 II. Request to Strike Paragraph 12 of the Superseding Indictment ...........378

 III. Motion to Preclude Introduction of Evidence at Trial ...................379

 IV. Motions to Sever Trial or Alternatively to Exclude Co–Defendant Statements at a Joint Trial ........................................386

 V. Motion for Expert Disclosure .......................................394

**Conclusion**..................................................394

## INTRODUCTION

A seven-count superseding indictment[1] ("Indictment") filed September 2, 2009, charges defendants Harry K. Kahale ("Kahale"), Harold Richard Graham ("Graham"), Gregory C. Scarlato ("Scarlato"), and Mitchell Reisman ("Reisman") with one count of conspiring to commit mail and wire fraud in violation of 18 U.S.C. §§ 1349,[2] 1341,[3] 1343[4] and 3551[5] et seq., five counts of mail fraud in violation of 18 U.S.C. §§ 1341, 2[6] and 3551 et seq. and one count of wire fraud in violation of 18 U.S.C. §§ 1341, 2 and 3551 et seq. (See

1. This indictment superseded the initial indictment which had previously been filed on March 19, 2009. (See Doc. No. 1, Initial Indictment.)

2. 18 U.S.C. § 1349 provides that the penalties for conspiracy match those for the substantive underlying offense.

3. 18 U.S.C. § 1341 provides, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier ... shall be fined under this title or imprisoned not more than 20 years, or both."

4. 18 U.S.C. § 1343 provides, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud ... transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

5. 18 U.S.C. § 3551 et seq. generally provides penalties for offenses described in any federal statute.

6. 18 U.S.C. § 2 provides that "whoever ... aids, abets, counsels, commands, induces or procures [the] commission" of an act or "willfully causes an act to be done" against the United States is punishable as a principal.

Doc.[7] No. 55, Superseding Indictment ("Ind't").) The Indictment also contains a criminal forfeiture allegation pursuant to 18 U.S.C. § 981[8] and 28 U.S.C. § 2461(c).[9] Now before the court are omnibus pretrial motions by defendants Reisman[10] and Graham[11] in which other defendants variously join.[12]

At a status conference on November 2, 2009, the parties agreed that the defendants' motions for *Brady/Giglio* material and notice pursuant to Federal Rule of Evidence 404(b) would become fully mooted by the government's subsequent sched-uled submissions.[13] Accordingly, defendants' outstanding motions, which are more fully outlined below, may be summarized as demands for: (1) bills of particulars; (2) striking paragraph 12 of the Indictment or language within it as surplusage; (3) precluding introduction of certain evidence related to Reisman's past business ventures under Federal Rules of Evidence 401 and 402, or alternatively under Federal Rule of Evidence 404(b), and precluding evidence of Reisman's and Kahale's prior convictions under Federal Rules of Evidence 403 and 404(b); (4)

7. All citations are to Docket 09–cr–159 unless otherwise noted.

8. 18 U.S.C. § 981(a)(1)(D)(v) and (vi) provide that property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of section 1341 (relating to mail fraud); or section 1343 (relating to wire fraud), is subject to forfeiture to the United States. The court notes that elsewhere the Indictment mistakenly cites to 18 U.S.C. § 981(a)(1)(C) (which provides for forfeiture in the context of various unrelated offenses).

9. 28 U.S.C. § 2461(c) provides: "If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case."

10. *See* Doc. No. 34, Memorandum of Law in Support of Defendant Mitchell Reisman's Omnibus Pretrial Motions dated 8/5/09 ("Reisman 8/5/09 Mem."); *see also* Doc. No. 57, Ltr. from JaneAnne Murray dated 9/3/09 ("Reisman 9/3/09 Ltr."); Doc. No. 93, Ltr. from JaneAnne Murray on behalf of Reisman dated 12/1/09 ("Reisman 12/1/09 Ltr.").

11. *See* Doc. No. 63, Memorandum of Law in Support of Pretrial Motions on Behalf of Defendant Harold Richard Graham dated 10/7/09 ("Graham 10/7/09 Mem.").

12. Scarlato and Graham joined in all of defendant Reisman's motions to the extent applicable, while Kahale joined in Reisman's motion for a bill of particulars only. (*See* Doc. No. 38, Ltr. from Jan A. Rostal on behalf of Scarlato dated 8/7/09 ("Scarlato 8/7/09 Ltr."); Doc. No. 35, Ltr. from Jeremy Gutman on behalf of Graham dated 8/6/09; Graham 10/7/09 Mem.; Doc. No. 36, Ltr. from Allen Lashley on behalf of Kahale dated 8/7/09.) Meanwhile, *Reisman* joined in Graham's motion for severance to the extent applicable. (*See* Doc. No. 77, Ltr. from JaneAnne Murray on behalf of Reisman dated 11/9/09 ("Reisman 11/9/09 Ltr.").) In addition, Scarlato and Kahale joined in all of Graham's motions to the extent applicable. (*See* Doc. No. 66 Ltr. from Allen Lashley on behalf of Kahale dated 10/21/09; Doc. No. 67 Ltr. from Jan A. Rostal on behalf of Scarlato dated 10/21/09.)

13. The Government has represented that it has complied with its obligation to disclose *Brady* material and recognizes its continuing obligation under *Brady*. (*See* Doc. No. 50, Ltr. from Tanya Hill dated 8/26/09; Doc. No. 83, Ltr. from Tanya Hill dated 11/6/09.) The government has also provided notice pursuant to Federal Rule of Evidence 404(b) to defendants Reisman and Kahale. (*See* Doc. No. 56, Ltr. dated 9/2/09 regarding Reisman ("Gov. Reisman 404(b) Ltr."); *see also* Doc. No. 84, Ltr. dated 10/7/09 providing 404(b) notice to Kahale "Gov. Kahale 404(b) Ltr.".) Finally, this court's 11/2/09 order directed the government to produce all *Giglio* material to defendants by 11/09/09.

severance into four separate trials and, in the alternative, exclusion of certain out-of-court statements by various co-defendants; and (5) an order directing the government to disclose its experts under Federal Rule of Criminal Procedure 16(a)(1)(G). The government opposes defendants' motions in their entirety. (*See* Doc. No. 49, Government's Memorandum of Law in Response to Defendants' Omnibus Pretrial Motions ("Gov. 8/26/09 Mem."); Doc. No. 68, Government's Memorandum of Law in Response to Defendant Richard Graham, Harry K. Kahale and Gregory C. Scarlato's Omnibus Pretrial Motions ("Gov. 10/23/09 Mem."); Doc. No. 100, Ltr. from Tanya Hill and Jonathan Green dated 12/4/09 ("Gov. 12/4/09 Ltr.").)

For the reasons set forth below, defendants' motions for bills of particulars are granted to the extent they request the identity of unindicted co-conspirators. The motions for bills of particulars are otherwise denied. The motions to strike paragraph 12 of the Indictment or language within it are denied. The motion to preclude the government from introducing at trial evidence of Reisman's other business ventures is denied with respect to the Philippine Islands Recovery Project, the CLH Loan Transaction, and V–4's connection to the Crude Oil Deal, which, as to all defendants, is direct evidence of the crimes charged pursuant to Federal Rule of Evidence 402. The motions to preclude evidence of the prior convictions of Kahale and Reisman are also denied, and such evidence, as to all defendants, is direct evidence of the crimes charged pursuant to Federal Rule of Evidence 402. The motions to preclude evidence of the Congo

Deal and the Able Income Fund LLC are denied as moot, given the government's stated intention not to introduce this evidence. The motion to preclude introduction of Reisman's other business ventures is otherwise granted. The motions to sever trial are denied and the motions to exclude the co-defendants statements at a joint trial are denied in part and granted in part. The portions of the co-defendants' statements which the government seeks to introduce are admissible, with limited exceptions discussed below. Finally, the motion to direct the government to disclose its experts under Federal Rule of Criminal Procedure 16(a)(1)(G) is denied as moot.

## BACKGROUND

### I. The Superseding Indictment

As alleged in the Indictment and the submissions of the government the facts are as follows:

Between 2003 and 2008, defendants and "others" allegedly conspired to fraudulently solicit investors and lenders to invest in the B.I.M. Mining Corporation ("B.I.M."), a Nevada-based corporation which defendants falsely portrayed as a "robust mining concern." (Ind't ¶¶ 1, 11; Gov. 10/23/09 Mem. at 13.) Kahale served as President, Chief Executive Officer and Treasurer of B.I.M., while Graham served as B.I.M.'s Secretary and Director. (*Id.* ¶¶ 4–5.) Scarlato and Reisman acted as agents for B.I.M. by soliciting investments on its behalf.[14] (*Id.* ¶¶ 6–7.)

Claiming that B.I.M. possessed rights to mineral and precious metal resources such as gold and "nickel babbit"[15] located in

---

**14.** The Indictment charges that Scarlato solicited investments for B.I.M. both individually and through his companies Metro Group and Thrift ("Metro"), and Alliance Group and

Brokerage LLC ("Alliance"). (Ind't ¶¶ 2, 3, 6.)

**15.** "Nickel babbit" is high-grade alloy used in the construction of engines and other types of

various places around the world, defendants allegedly falsely represented that B.I.M. needed investor funds to process, transport and market those assets. (*Id.* ¶ 11.) Defendants allegedly falsely promised investors and lenders that upon completion of these processes, the investments would yield significant returns.[16] In exchange for investor money, defendants allegedly issued fraudulent "gold delivery certificates" which promised investment returns within a specified period of time, usually between two and twelve months. (*Id.* ¶ 13.) These returns never materialized. Rather, upon maturation of the gold delivery certificates, the Indictment claims that defendants sent the investors letters stating, in substance, that B.I.M. had experienced numerous delays, that B.I.M. was close to completion of the refinement process, and that the gold delivery certificates would be redeemed soon. (*Id.* ¶ 14.) Specifically, the defendants allegedly mailed letters falsely attributing the delays to, among other things, Kahale's hospitalization, a delay in responses from federal agencies, fundraising for further overseas travel, and efforts to secure an additional diplomatic channel. (Gov. 10/23/09 Mem. at 6–7.)

In reality, rather than using investor funds as promised to develop gold and other mineral assets, defendants allegedly used the money to pay earlier investors and lenders and for defendants' own personal expenses. (Ind't ¶ 15.) For example, Scarlato allegedly kept the majority of the investment money he collected from victims. (Gov. 8/26/09 Mem. at 8.) Similarly, in one instance Reisman allegedly collected $100,000 from a victim and kept the entire amount for use on a down payment for his own house and to repay a prior debt. (*Id.* at 9.)

As part of the scheme, in order to induce investors and lenders to invest in B.I.M., the defendants allegedly made false representations about B.I.M.'s assets, operations, and defendants' own backgrounds. (Ind't ¶ 12.) For example, defendants allegedly stated that B.I.M. owned mines and had relationships with entities such as mining companies and foreign government representatives and others. (Gov. 10/23/09 Mem. at 4.) Meanwhile, according to the government, B.I.M. neither possessed nor had any rights to gold or other precious metals. (*Id.* at 5.) In addition, defendants allegedly represented that B.I.M. possessed assets in the hundreds of millions or billions of dollars, while in fact the government contends that B.I.M. rarely had a bank balance in excess of $100,000 and that it had no money that did not come from victims of the fraud. (*Id.*; *see also* Gov. 8/26/09 Mem. at 6.) In addition, defendants allegedly falsely claimed that Kahale was a retired general in the United States military with overseas contacts. Reisman also allegedly claimed he was a Certified Public Accountant ("C.P.A."); however, according to the government, Reisman previously had been convicted of theft by deception and securities fraud, barred from the investment industry,[17] and forced to relinquish his C.P.A. license. (Gov. 8/26/09 Mem. at 7.)

In order to execute the fraudulent scheme, the Indictment charges that de-

---

machinery. (Gov. 8/26/09 Mem. at 6.)

**16.** The government does not allege any particular promised rate of return.

**17.** Reisman disputes this characterization. (*See* Reisman 12/1/09 Ltr. at 4 ("Mr. Reisman was not barred from the 'investment industry' as the Government alleges. He was barred from the 'security investment field'—a phrase that is not defined in his judgment, presentence report or in the minutes of his sentencing, but is clearly a far narrower bar than that claimed by the Government.").)

fendants engaged in mail and wire fraud. (Ind't Counts Two through Seven.) Specifically, the Indictment alleges that defendants mailed or caused to be mailed five letters and lists the approximate dates they were mailed, the point of origin, and destination. (*Id.* at Counts Two through Five.) In addition, the Indictment alleges that defendants caused a check in the amount of $200,000 to be mailed from an investor in Falconer, New York to Scarlato in Slatington, Pennsylvania. (*Id.* at Count Six.) Finally, the Indictment alleges that the defendants transmitted and caused to be transmitted a $900,000 wire transfer on or about October 27, 2005 from Commerce Bank in New Jersey to HSBC Bank in Brooklyn, New York. (*Id.* Count Seven.)

## II. The Civil Lawsuit and Criminal Investigation

All of the defendants here, with the exception of Reisman, are also defendants in a related civil action filed by an alleged B.I.M. investor. (*See Valenti v. B.I.M. Mining Corp.,* 07 Civ. 1402(LDW) (E.D.N.Y.).) The civil lawsuit makes similar allegations to those contained in the Indictment. (*See generally* Dkt. No. 07 Civ. 1402, Doc. No. 1, Complaint.)[18] During the course of the civil litigation, Kahale, Graham and Scarlato gave deposition testimony relating to B.I.M. (*See generally* Doc. No. 87, Ltr. from Tanya Hill and Jonathan Green dated 11/24/09 attaching deposition testimony and statements made to the FBI ("Gov. 11/24/09 Stmts. Ltr.").)

In addition, during the criminal investigation by the FBI into investments related to B.I.M., Kahale, Graham and Scarlato made statements to the FBI which were memorialized by FBI agents on Form FD–302 ("302 Statements"). (*See id.*)

## III. Discovery and the Pretrial Order

On June 1, 2009, a full eight months before trial is scheduled to begin on February 1, 2010, the government provided defendants with discovery consisting of approximately four boxes of documents, supplemented by a detailed index. (*See* Gov. 10/23/09 Mem. at 15.) The government has also provided limited additional discovery since that date. (*See, e.g.,* Doc. No. 103, Ltr. from Tanya Hill and Jonathan Green dated 12/9/09; *see also* Doc. No. 108, Ltr. from Tanya Hill and Jonathan Green dated 12/17/09.) The government's June 2009 discovery letter identifies the names of many victims and the ranges of bates numbers relevant to those victims. (*Id.* at 12.) The discovery itself included various documents, some of which came from victims' files, including copies of bank and other records such as copies of email messages, letters, gold delivery certificates, copies of checks and other information. (*Id.*) The government has represented that "[i]t is these documents that were provided to the victims that the government alleges are false and fraudulent." (*Id.* at 15.)

In addition to the discovery, the government's submissions on the instant motions have made additional factual disclosures and specifications about the particulars of the unlawful transactions. (*See generally* Gov. 8/26/09 Mem., *see also* Gov. 10/23/09 Mem.) Finally, pursuant to the court's pretrial orders, the government has provided and will provide additional information to the defendants. For example, the government has provided copies of the B.I.M. deposition testimony and the 302 Statements made by Kahale, Graham and Scarlato. (Gov. 11/24/09 Stmts. Ltr.) In addition, prior to the pretrial conference in January 2010, the government will provide

18. The civil case has been closed without prejudice to reopen pending the outcome of these criminal proceedings. (*See* Dkt. No. 07 Civ. 1402, Order dated 9/23/09.)

witness lists, a list of persons, corporations, institutions, places and scientific, technical, or colloquial terms that will be presented or referred to by counsel during trial, and 3500 material. (*See* Doc. No. 97, Second Amended Pretrial Order dated 12/1/09.)

## DISCUSSION

### I. Requests for Bills of Particulars

Defendants all move [19] for bills of particulars under Federal Rule of Criminal Procedure 7(f). The particulars sought by defendants can be grouped into four general categories: (1) the identities of any alleged unindicted co-conspirators; (2) the identities of alleged victims; (3) the particulars of the unlawful transactions alleged; and (4) identification of any specific property deemed forfeitable by the government. (*See* Reisman 8/5/09 Mem. at 5; Scarlato 8/7/09 Ltr.; Graham 10/7/09 Mem. at 6, *see also* Graham 10/7/09 Mem. at Ex. 63–3.) [20] Each category of particulars is addressed in turn.

### A. Standards Applicable to Requests for Bills of Particulars

■ A decision of whether to grant a bill of particulars under Rule 7(f) of the Federal Rules of Criminal Procedure is one which rests within the sound discretion of the trial court. *See, e.g., United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987). In exercising that discretion, however, a trial court is guided by the limited functions that bills of particulars are designed to achieve, namely, to allow a defendant to "identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Id.*

■ Notably, the "[a]cquisition of evidentiary detail is not the function of the bill of particulars." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990) (upholding denial of bill of particulars where requests amounted to "ill-disguised attempts at general pre-trial discovery") (internal quotation omitted); *see also United States v. Feola,* 651 F.Supp. 1068, 1123 (S.D.N.Y.1987), *aff'd without op.* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989) (noting courts' refusals "to treat a bill of par-

**19.** Reisman, joined by Kahale, Scarlato and Graham, filed a motion requesting particulars with respect to the initial indictment. (*See* Reisman 8/5/09 Mem.; *see also* Doc. Nos. 35, 36, 38.) Scarlato also filed additional requests in connection with the initial indictment. (*See* Scarlato 8/7/09 Ltr.) Because these motions have not been withdrawn, the court assumes that defendants continue to seek the requested particulars in connection with the Superseding Indictment and addresses those requests accordingly and in that context. Graham's motion for particulars, joined by Kahale and Scarlato, is based on the Superseding Indictment.

**20.** While joining in defendant Reisman's motion for a bill of particulars, Graham also separately: (1) sent a letter dated August 5, 2009 to the government requesting certain particulars (Doc. No. 37–1); (2) sent a second letter to the government dated September 25, 2009 requesting particulars (Doc. No. 63–1); and (3) filed a motion dated October 7, 2009 requesting particulars (Doc. No. 63). Graham's October 7th motion states that "the specific particulars requested are set forth in Exhibit A." (Graham 10/7/09 Mem. at 6.) However, Exhibit A contains a copy of Graham's September letter to the government (*see* Doc. No. 63–1), while Exhibit C to the memorandum contains a list of particulars identified as the "modification and amendment of the requests sent to the government on behalf of … Graham" (*see* Doc. No. 63–3). Accordingly, the court assumes that Exhibit C to Graham's motion papers contains the amended particulars Graham wishes the court to consider.

ticulars as a general investigative tool for the defense, or as a device to compel disclosure of the government's evidence or its legal theory prior to trial"); *United States v. Rigas*, 258 F.Supp.2d 299, 304 (S.D.N.Y. 2003) ("bill of particulars cannot ... be used as a discovery vehicle or as a means to lock the government into its proof"). Accordingly, a bill of particulars should "be required *only* where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234 (emphasis added) (internal citations omitted).

■ Even where an indictment contains some apparent deficiency, "if the information sought by defendant is provided ... in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574; *see also United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999) ("bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means" including discovery which "adequately differentiated the charges" and prevented surprise at trial).

■ However, "[t]he Government [does] not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided" as to which documents are relevant to the charged conduct. *Bortnovsky*, 820 F.2d at 575; *see also United States v. Bin Laden*, 92 F.Supp.2d 225, 234 (S.D.N.Y.2000) ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."). On the other hand, no bill of particulars is warranted where "the Indictment, discovery, and other information provided by the government adequately notify [d]efendants of the charges against them." *Rigas*, 258 F.Supp.2d at 305.

■ Thus, in assessing whether a bill of particulars is warranted, the proper inquiry is not whether the requested information would be helpful to the defense (which it almost invariably would), but rather whether the information is *necessary* to the defense. *See Torres*, 901 F.2d at 234 ("The function of a bill of particulars is to provide [the] defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at the trial.") (emphasis added) (internal quotations omitted); *see also United States v. Chalmers*, 410 F.Supp.2d 278, 286 (S.D.N.Y.2006). In conducting this inquiry, the trial court "must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery ..." *United States v. Solomonyan*, 452 F.Supp.2d 334, 349 (S.D.N.Y.2006) (internal citation omitted).

### B. Application

#### 1. *Identities of Unindicted Co–Conspirators*

■ Defendants seek the identities of any unindicted co-conspirators. (*See* Reisman 8/5/09 Mem. at 6; Graham 10/7/09 Mem. at Ex. C ¶ 5; Scarlato 8/7/09 Ltr. at 1–2.) Defendants claim that without this information it will be "virtually impossible for the defendants to investigate the allegations as to which they will have to prepare a defense," and Reisman also claims that his need for this information is particularly acute given his extensive and legitimate business dealings with a wide range of associates. (Graham 10/7/09 Mem. at 3; Reisman 8/5/09 Mem. at 6.) The government contends that requiring the government to identify and classify "others who may have participated in this conspiracy as

... a co-conspirator ... would unfairly limit the government's proof and unfairly injure the reputation of individuals who have not been charged with a crime by a grand jury." (Gov. 8/26/09 Mem. at 15–16.)

There is no clear rule in the Second Circuit as to when a bill of particulars for unindicted co-conspirators should be granted. *See, e.g., United States v. Nachamie*, 91 F.Supp.2d 565, 572 (S.D.N.Y. 2000) ("A review of the case law in this district reveals no clear distinction among circumstances in which courts grant a request for the names of known unindicted co-conspirators and circumstances in which they do not."). Indeed, "[t]he Second Circuit has upheld decisions [both] granting and denying requests for the identity of co-conspirators." *Chalmers*, 410 F.Supp.2d at 286 (collecting and comparing cases).

However, in assessing whether a bill of particulars revealing the names of unindicted co-conspirators would accomplish the permissible goals of providing a defendant with necessary information to prepare for trial and avoid surprise, courts in this Circuit have routinely evaluated six factors:

> (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation.

*Nachamie*, 91 F.Supp.2d at 572. Here, evaluation of these factors indicates that a bill of particulars identifying those unindicted co-conspirators known to the government is necessary to allow the defendants to adequately prepare their defenses and avoid unfair surprise at trial.

First, the number of potential co-conspirators is potentially large as there are four indicted defendants and an unknown number of unindicted individuals. Second, the alleged duration of the conspiracy, five years, is relatively lengthy. In addition, the geographic scope of the conspiracy—which allegedly spanned from the New York metropolitan area to Nevada and potentially to unknown international locations—is expansive. Accordingly, because "a large number of co-conspirators and a long-running conspiracy" both increase the chance of surprise to the defendant at trial, both of the first two factors weigh in favor of granting a bill of particulars. *Id.* at 572–73 (granting bill of particulars identifying known unindicted co-conspirators in case involving a "large number of co-conspirators (eight defendants and an unknown number of unindicted co-conspirators)" and lasting a "significant period of time (more than three years)"); *see also United States v. Oruche*, No. 07–cr–0124, 2008 WL 612694, at *4, 2008 U.S. Dist. LEXIS 16701, at *9–10 (S.D.N.Y. Mar. 5, 2008) (finding that "breadth of the conspiracies" which spanned a "number of years and continents" weighed "in favor of disclosure of the unindicted co-conspirators").

Further, while analysis of the fourth factor reveals that the government appears to have provided significant detail to the defendants and has not unfairly overwhelmed them with mountains of unorganized discovery, it is clear that the disclosures to date fail to meet the test under the third factor and that the defendants do not have adequate information to prepare for trial and avoid unfair surprise. Specifically, in Count One of the Indictment the defendants are charged with having conspired with "others" who remain unindicted, unnamed, and potentially unknown.

This fact, considered in the context of an alleged conspiracy spanning a large number of years and involving an unknown number of co-conspirators and geographic locales, reveals that in order to adequately prepare for trial and avoid unfair surprise, the defendants must be able to ascertain which primary actors they are accused of having conspired with. *See Feola,* 651 F.Supp. at 1133 (despite "substantial materials [that] have already been disclosed," requiring identification of unindicted co-conspirators in order to permit adequate preparation of the defense).

Further, neither of the last two factors counsel against it. The government has asserted no basis to fear that revealing the identities of the unindicted co-conspirators will jeopardize their safety, create risk of witness tampering, or compromise an ongoing government investigation.[21] *Cf. Chalmers,* 410 F.Supp.2d at 286 (rejecting request for bill of particulars identifying unindicted co-conspirators where "significant" concern for ongoing government investigation); *United States v. Gammarano,* No. 06–cr–0072, 2007 WL 2077735, at *11, 2007 U.S. Dist. LEXIS 52059, at *45 (E.D.N.Y. July 18, 2007) (same, where court had "a definite reason to be concerned about the safety of potential witnesses"). Nor does there appear to be any legitimate basis for concern about these issues in this white-collar fraud action involving no allegations of violence. *See, e.g., Nachamie,* 91 F.Supp.2d at 573 (noting no concern that disclosing identities of unindicted co-conspirators will endanger those individuals where the crimes charged involved fraud, "not narcotics trafficking or murder").

Finally, the relative complexity of the fraud charges facing defendants, an additional factor not considered in *Nachamie,* also weighs in favor of requiring disclosure. Certain charges, such as the fraud charges alleged here, by their nature carry a greater potential for causing unfair surprise at trial due to their complexity. *See, e.g., Solomonyan,* 452 F.Supp.2d at 350 (noting that defendants in case involving arms trafficking conspiracies that are not "complex" do not need to identify unnamed co-conspirators "in order to piece together the nature of the charges against them" in the same way as might "defendants in an intricate fraud conspiracy"); *see also United States v. Patterson,* No. 02–cr–0283, 2002 WL 31890950, at *10, 2002 U.S. Dist. LEXIS 24796, at *29 (S.D.N.Y. Dec. 27, 2002) (denying bill of particulars where indictment charged a "straightforward ... marijuana distribution scheme" over a period of approximately six months as opposed to a more complex conspiracy). Where, as here, the acts which form the basis of the charges may outwardly appear to be legitimate business communications, there is a greater potential for confusion over what precisely the government intends to prove at trial and a concomitant greater need to identify with some particularity the "others" who are referred to in the Indictment so that defendants can adequately prepare for trial.[22]

---

21. The government instead contends that identifying unindicted co-conspirators would "unfairly injure the reputation of others who have not been charged with a crime." (Gov. 8/26/09 Mem. at 15–16.) However, the government cites no Second Circuit case denying a request for a bill of particulars on this ground or even weighing this consideration, and the court therefore declines to weight this concern in its analysis.

22. Indeed, *Rigas,* the very case the government directs the court to consider because it is "far more applicable" to the facts here than the other complex cases cited by defendants, supports this view. (Gov. 10/23/09 Mem. at 17–18 (citing *United States v. Rigas,* 258 F.Supp.2d 299.).) *Rigas* involved complex charges of securities, bank and wire fraud, and conspiracy and the defendants in that case requested particulars similar to the re-

Moreover, to the extent the government claims that the identification of the unindicted co-conspirators will "unfairly limit the government's proof" at trial, the court disagrees. The court declines to accept that the limited particularization of the identities of unindicted co-conspirators who are known to the government and whose identities are "crucial to the preparation of the defense" will substantially prejudice the government or limit its proof at trial. *See Feola,* 651 F.Supp. at 1133. Accordingly, by December 30, 2009, the government shall produce a bill of particulars identifying, for each paragraph of the Indictment that contains the word "others," the identities, if known to the government, of all unindicted co-conspirators.

### 2. Identities of Victims

Defendants also seek the identities of the alleged victims. (*See* Reisman 8/5/09 Mem. at 9; Graham 10/7/09 Mem. at 6; Scarlato 8/7/09 Ltr. at 1–2.) There is no dispute that the discovery provided by the government contains the identities of all the victims of the alleged fraud. (*See* Reisman 8/5/09 Mem. at 14–15; Gov. 8/26/09 Mem. at 14.) Further, as noted above, the discovery produced to date, consisting of approximately four boxes of indexed documents and provided more

than eight months in advance of trial, is not particularly voluminous or burdensome. (*See* Gov. 10/23/09 Mem. at 15.) Thus, the defendants already have, in accessible format, all of the requested information regarding the identities of the alleged victims, and their request for a bill of particulars further identifying the alleged victims is therefore denied. *See, e.g., Bortnovsky,* 820 F.2d at 574 ("Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required.").

### 3. Particulars of the Unlawful Transactions, Representations, and Misappropriations Alleged

Next defendants contend that the government should be required to particularize the unlawful transactions that form the basis of the charged conspiracy, including: (a) "when and where the individual financial transactions allegedly occurred, [and] the amounts, financial institutions and bank accounts involved" (Reisman 8/5/09 Mem. at 9); (b) "what particular representations about the assets, B.I.M.'s business operations, and the defendants' background and business contacts were allegedly made," (Graham 10/7/09 Mem. at 6),[23] and specifically what "'assets' the defen-

---

quests here. *See Rigas,* 258 F.Supp.2d 299. Yet contrary to the government's assertion (Gov. 10/23/09 Mem. at 17–18), the *Rigas* court did not preclude the defendants in that case from obtaining the identities of unindicted co-conspirators, *Rigas,* 258 F.Supp.2d 299. To the contrary, the *Rigas* court denied only defendants' supplemental requests for bills of particulars, and did so only after the parties had jointly agreed that the government would provide a "bill of particulars addressing [d]efendants' general areas of concern" including the request for "the identity of any co-conspirators or other participants in the criminal activity." *See Rigas,* 258 F.Supp.2d at 303, 305. Thus, the *Rigas* court found that the complex fraud schemes alleged in that case warranted identification of the unindicted co-

conspirators to permit proper preparation for trial. The complexity of the fraud scheme alleged here warrants the same result.

**23.** Specifically, Graham requests the "date, location, and substance [of] the specific misrepresentations that were allegedly made, by whom and to whom [and the manner in which] they were made," (Graham 10/7/09 Mem. Ex. C ¶ 3; *see also* Scarlato 8/7/09 Ltr. at 1–2 (requesting particulars regarding "the precise representations or promises that the Government will allege at trial were materially fraudulent, noting how they were made (orally or in writing) and providing approximate dates).)

dants allegedly falsely claimed were within B.I.M.'s control, and ... the location of those assets," (*Id.* at Ex. C ¶ 1); and (c) "the transactions by which investor funds were allegedly used for personal expenses, the funds used, and the expenses for which they were used." (*Id.* at Ex. C ¶ 4; *see also* Scarlato 8/7/09 Ltr. at 1–2.)

Returning to the permissible purpose of a bill of particulars, which is to provide information "necessary" to the defense, it is clear that a bill of particulars is unwarranted for each of defendants' specific requests in this category. *See, e.g., Torres,* 901 F.2d at 234. Indeed, "[a]s a general rule, the defendant does not 'need' detailed evidence about the conspiracy in order to prepare for trial properly" for "[i]t is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the government intends to adduce to prove their criminal acts." *Feola,* 651 F.Supp. at 1132 (citing *United States v. Carroll,* 510 F.2d 507, 509 (2d Cir.1975), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2633, 49 L.Ed.2d 378 (1976) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge") (internal citation omitted)); *see also United States v. Jimenez,* 824 F.Supp. 351, 363 (S.D.N.Y.1993) (observing that requests for bills of particulars disclosing "whens" "wheres" and "with whoms" are routinely denied). Particulars relating to the allegedly unlawful transactions themselves, the alleged misrepresentations, and the alleged personal uses of the investor funds will be discussed in turn.

#### a) *Particulars of the Transactions Themselves*

■ The government need not inform the defendants of the particulars such as the bank accounts, amounts, and dates of the fraudulent transactions alleged with any greater specificity than it already has. The Indictment describes in considerable detail the alleged conspiracy to defraud investors by misrepresenting that B.I.M. possessed rights to gold and other minerals such as nickel babbit, issuing "gold delivery certificates" in exchange for investor money, misleading investors into believing they would obtain a high rate of return on their investments, and falsely stating in letters to investors that the certificates "would be redeemed soon" while their investments were allegedly being used for other improper purposes. (Ind't ¶¶ 11–15.) Additionally, the government has also provided extensive additional information to defendants through post-Indictment discovery and filings. (*See generally* Gov. 8/26/09 Mem. at 5–9; *see also* Gov. 10/23/09 Mem. at 4–8.)

Defendants' attempts to analogize this case to one where the "overwhelming" amount of discovery itself triggers a need for greater specificity in a bill of particulars are unavailing. (*See* Reisman 8/5/09 Mem. at 7–9; Graham 10/7/09 Mem. at 2–3); *see also United States v. Mahaffy,* 446 F.Supp.2d 115, 119–20 (E.D.N.Y.2006) (discussing the "discernible principle" in *Bortnovsky* "that a large volume of discovery warrants a bill of particulars if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendants' preparation for trial" by effectively shifting the burden of proof to the defense). First, the discovery here consists of approximately 5,000 pages in less than four boxes of documents—a significant but far from overwhelming volume. (*See* Gov. 10/23/09 Mem. at 15.) This relatively modest volume of documents accompanied by a detailed index is far from the "mountains of documents" at issue in *Bortnovsky* and *Nachamie. Cf. Bortnovsky,* 820 F.2d at 575 (government provided "mountains of docu-

ments to defense counsel who were left unguided as to which documents" were relevant to the charged conduct); *Nachamie,* 91 F.Supp.2d at 571 (government produced "over 200,000 pieces of paper in hundreds of boxes" but failed to inform defendants which of over 2,000 Medicare claims would be proven fraudulent).

Additionally, unlike the circumstances here, both *Bortnovsky* and *Nachamie* presented the quintessential "needle in a haystack" problem to defendants who were faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent. *See Bortnovsky,* 820 F.2d at 574 (government failed to specify "which of numerous" insurance claims were allegedly fraudulent); *Nachamie,* 91 F.Supp.2d at 571 (government failed to identify which of "2,000 Medicare claims" were allegedly fraudulent). By contrast, and contrary to Graham's characterizations of the allegations as "vague," "broad and non-specific," (Graham 10/7/09 Mem. at 3, 4), the Indictment and discovery materials here provide adequate notice to defendants of the crimes charged and specify precisely that the allegedly fraudulent transactions at issue involved investments made in B.I.M. in exchange for which fraudulent "gold delivery certificates" were issued.

Accordingly, the defendants' request for particulars as to "when and where the individual financial transactions allegedly occurred, [and] the amounts, financial institutions and bank accounts involved" (Reisman 8/5/09 Mem. at 9) is denied because it seeks evidentiary detail not required in order to provide fair notice of the charges. *See, e.g., Jimenez,* 824 F.Supp. at 363 (government "may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which a defendant committed the crime charged, or to give a preview of its evidence and legal theories").

b) *Particularization of False Representations Including Particulars Regarding the Assets Allegedly Within B.I.M.'s Control*

■ Similarly, defendants are not entitled to a bill of particulars identifying the particulars of the false representations alleged or the assets allegedly within B.I.M.'s control. As noted above, the Indictment, discovery, and supplemental government disclosures have provided ample notice to defendants of the crimes charged here.

For example, the Indictment gives specific notice of four allegedly fraudulent letters sent to investors regarding redemption of the gold delivery certificates and an additional letter from an investor containing a check for $200,000, and details the dates, points of origin, destinations, and the brief contents of those letters. (Ind't Counts Two through Six.) The government's motion papers provide additional detail about the alleged false representations outlined in the Indictment concerning B.I.M.'s size and business operations and defendants' backgrounds and business contacts. (*See* Ind't ¶ 12; *see also* Gov. 8/26/09 Mem. at 5–8; Gov. 10/23/09 Mem. at 4–6, 12–13.) Specifically, the government has claimed that defendants falsely represented that B.I.M. had assets in the hundreds of millions, or billions of dollars, when it had a balance rarely exceeding $100,000. Further, defendants allegedly falsely stated that Kahale was a general in the United States military and falsely claimed that Reisman was a C.P.A. (Gov. 8/26/09 Mem. at 5–8.) Further, the government has represented that while the defendants made the alleged misrepresentations both verbally and in writing, the "defendants have possessed for many

months all the documents which contain these lies." (Gov. 10/23/09 Mem. at 13.)

Defendants are not entitled to further particulars with respect to the alleged misrepresentations.

### c) *Particulars Regarding Transactions Whereby Funds Were Diverted for Personal Use*

■ The request for particulars regarding the individual transactions in which funds were diverted for personal use is likewise denied. The facts section of the government's motion papers already identifies with particularity specific personal expenses on which investor money was spent. (Gov. 10/23/09 Mem. at 7–8.) Further particularization of these expenses is unnecessary to provide fair notice of the crimes charged and therefore would merely "amount to an unnecessary revelation of evidence." *See, e.g., Feola*, 651 F.Supp. at 1133.

Through the Indictment, discovery, and additional disclosures in other filings, in conjunction with the additional disclosure of the identities of any unindicted co-conspirators, the government will have discharged its obligation to adequately notify the defendants of the pending charges. The government is not required to do more. Accordingly, the requests for additional particulars related to the allegedly unlawful transactions, alleged misrepresentations, and alleged diversion of investor funds are denied. *See Nachamie*, 91

F.Supp.2d at 575 (noting that it "is not required" for the government "to lay out its proof ... months before trial").

### 4. *Identification of Specific Assets Deemed Forfeitable*

■ The Indictment provides notice that the government will seek forfeiture of property "including but not limited to a sum of money up to a value of not less than $1,040,000 in United States currency, representing the amount of proceeds obtained as a result of the scheme described in the above-listed offenses." (Ind't ¶ 22.) Defendants seek to compel the government to disclose any specific property deemed forfeitable by the government. (*See* Graham 10/7/09 Mem. at Ex. C ¶ 6; *see also* Scarlato 8/7/09 Ltr. at 2.)

■ While two rules of federal criminal procedure require the government to provide notice of its intent to pursue criminal forfeiture,[24] there is no requirement that the government individually itemize the property subject to forfeiture in an indictment. *See United States v. Grammatikos*, 633 F.2d 1013, 1024 (2d Cir.1980) ("The plain language of Rule 7(c)(2) requires only that the extent of the interest or property subject to forfeiture be alleged. That condition was satisfied here since the superseding indictment announced that the government would seek all of appellant's interest or property in the illicit enterprise of which he was the sole proprietor.").[25]

---

**24.** Federal Rule of Criminal Procedure Rule 7(c)(2) precludes entry of a judgment of forfeiture if the charging indictment or information fails to provide notice "that the defendant has an interest in property that is subject to forfeiture." *Id.* Similarly, Federal Rule of Criminal Procedure 32.2(a) bars a court from entering a judgment of forfeiture "unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute." *Id.*

**25.** The Advisory Committee Notes to the 2000 Amendments of Federal Rule of Criminal Procedure 32.2(a) support this view, providing: "As courts have held, subdivision (a) is not intended to require that an itemized list of the property to be forfeited appear in the indictment or information itself.... [Rule 7(c)] does not require a substantive allegation in which the property subject to forfeiture, or the defendant's interest in the property, must be described in detail." *Id.* (citing *United*

Accordingly, defendants' request for a bill of particulars identifying specific property subject to forfeiture is denied.

## II. Request to Strike Paragraph 12 of the Superseding Indictment

■ Reisman moves to strike "the language [in the Indictment] . . . relating to defendants' lies about their backgrounds," while Graham moves to strike paragraph 12 of the Indictment in its entirety as prejudicial and confusing surplusage. (*See* Reisman 12/1/09 Ltr.; Graham 10/7/09 Mem. at 9–11.) [26] Paragraph 12 of the Indictment alleges that defendants "made false representations to investors, lenders and potential investors regarding, among other things: (a) B.I.M.'s size and business operations; and (b) the defendant's backgrounds and business contacts." [27] Reisman contends that the language should be stricken because this language refers only to Reisman's alleged omissions regarding his background and qualifications which "are irrelevant because defendants had no duty to speak" to potential investors, and absent any such duty "the omissions-based allegations are clearly prejudicial." (Reisman 12/1/09 Ltr. at 5.) Meanwhile, Graham asserts that such misrepresentations, even if true, would not qualify as "material" because they are not relevant to the benefit investors intended to receive, and thus

could not sustain a charge of mail or wire fraud. (Graham 10/7/09 Mem. at 9–11.)

■ Federal Rule of Criminal Procedure 7(d) allows a court, in its discretion, to strike surplusage from an indictment. A motion to strike should be granted where "the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir.1990). However, "[i]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* at 1013 (internal citation omitted).

First, contrary to Reisman's assertions, the government seeks to introduce more than Reisman's omissions that he had been forced to relinquish his C.P.A. license and barred from the "security investment field." (*See* Reisman 12/1/09 Ltr. at 4–5.) In fact, the government seeks to introduce Reisman's affirmative misrepresentation that he possessed a C.P.A. license. (*See* Gov. 12/4/09 Ltr. at 5.) This misrepresentation is neither irrelevant nor prejudicial. Rather, it is highly probative of the alleged conspiracy because it may have helped to lure investors into the alleged B.I.M. scheme by lending an aura of validity and financial strength to the corporation that was to be the alleged vehicle of the fraud. Indeed, an investor who believed Reisman

---

States v. DeFries, 129 F.3d 1293 (D.C.Cir. 1997)).

26. Kahale and Scarlato join in the request to strike surplusage. Notably, while the other defendants had briefed these arguments in October, Reisman waited until December 1, 2009, almost three months after the date of the Superseding Indictment and long after the court's deadlines for briefing pretrial motions had passed, to first move to strike this language from the Indictment. Despite the tardiness of Reisman's submission, the court has considered his additional arguments but rejects them on the merits.

27. As noted above, the government has further detailed these allegations by proffering that it specifically intends to show at trial that defendants, *inter alia:* (1) falsely stated to investors that Kahale was a retired general in the United States military; (2) misrepresented that Reisman was a Certified Public Accountant; and (3) falsely represented that B.I.M. had assets in the hundreds of millions or billions of dollars, while it in fact rarely had a bank balance in excess of $100,000. (Gov. 10/23/09 Mem. at 5–6.)

possessed a special degree of financial sophistication by virtue of his C.P.A. license may have logically assumed that the investment vehicle recommended by Reisman offered sound financials.

Moreover, to the extent the government seeks to introduce evidence of Reisman's failure to disclose that he had been required to relinquish his C.P.A. license and barred from the "security investment field," these omissions are likewise relevant and non-prejudicial. Reisman may in fact have had a duty to disclose this information arising from any initial alleged misrepresentation that he was a C.P.A. if the investors were operating under the mistaken assumption that he did actually possess such accreditation. *See Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1484 (2d Cir. 1995) ("[A] duty to disclose may arise if ... one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party ..." and "it becomes apparent ... that another party is operating under a mistaken perception of a material fact"); *see also United States v. Autuori,* 212 F.3d 105, 118–19 (2d Cir.2000) ("Under the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.") (internal citation omitted).

Meanwhile, Graham's assertion that the misrepresentations referred to in paragraph 12 relating to the size and business operations of B.I.M. and the backgrounds and business contacts of the defendants "do not relate to the value or nature of the proposed investment" is simply incorrect. (Graham 10/7/09 Mem. at 10 (citing *United*

*States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987) (requiring a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver" in order to make out conviction of mail fraud)).) Rather, a fact finder could easily conclude that an investor weighing whether to invest in a financial product backed by nickel babbit, gold, and other assets allegedly located around the globe could have anticipated greater benefits from the investment and been more willing to invest because of the alleged misrepresentations regarding B.I.M.'s status as a "robust mining concern," Kahale's status as a retired military general, and Reisman's status as a C.P.A. (*See* Gov. 10/23/09 Mem. at 13, 22–23.)

Thus, the misrepresentations alleged in paragraph 12 are directly related to the "very nature of the bargain" between the defendants and the investors because the alleged statements essentially misrepresented the nature and value of the investments themselves and of B.I.M. and its principals and agents. *Cf. Starr,* 816 F.2d at 98 (finding alleged scheme to defraud did not fall within the mail fraud statute when the "customers received exactly what they paid for"). Accordingly, paragraph 12 of the Indictment is relevant and non-prejudicial and the motions to strike this paragraph or portions of it are denied.

## III. Motions to Preclude Introduction of Evidence at Trial

All defendants move for an order precluding the introduction of evidence of Reisman's other business ventures. (*See* Reisman 8/5/09 Mem. at 9–10; Reisman 9/3/09 Ltr.; Reisman 12/1/09 Ltr.; Graham 10/7/09 Mem. at 12–18.) [28] Specifically,

---

**28.** As noted above, the remaining defendants filed various letters joining the substantive

motions filed by Reisman and Graham.

Reisman argues that the government should be precluded from introducing evidence of the following non-exclusive list of business ventures:

- Recovery of assets from the Philippine Islands, ("Philippine Islands Recovery Project");
- Loan transaction involving Caring Little Hands charity ("CLH Loan Transaction");
- Development of a children's dinosaur magazine called "Dinozine";
- "See it Live," a project related to video-streaming to cell-phones;
- Contracts for the sale of sugar involving World Commodities Group Delaware Ltd. and Institute of Material Trading, (the "Sugar Deal");
- Sale of crude oil from EC4 Petrochem Ltd. to Thai Petrochemical Industry, PLC, (the "Crude Oil Deal");
- Geological extraction in the Congo with K.M. Mining, (the "Congo Deal"); and
- Loan transactions involving Able Income Fund LLC. (Reisman 8/5/09 Mem. at 10.)

Reisman first argues that evidence of these other business ventures should be precluded under Federal Rules of Evidence 401 and 402 [29] on the grounds that the evidence is irrelevant and will "obscure[ ] the matters at issue . . . needlessly confuse the jury and waste its time." (*Id.*)

Alternatively, Reisman contends that the evidence should be excluded under Federal Rule of Evidence 404(b) and 403 because the dangers of "unfair prejudice, confusion of the issues, and waste of time" outweigh any probative value. (Reisman 9/3/09 Ltr. at 2; Reisman 12/1/09 Ltr. at 5–6.) Meanwhile, Graham also advocates for preclusion of the evidence and asserts that without preclusion, Reisman's trial must be severed. (Graham 10/7/09 Mem. at 18.) [30]

Both Graham and Scarlato [31] also appear to move to exclude evidence of Reisman and Kahale's prior convictions on the grounds that the introduction of such evidence would be unfairly prejudicial. (*See* Graham 10/7/09 Mem. at 17; Doc. No. 76, Ltr. from Jan Rostal on behalf of Scarlato dated 11/9/09 ("Scarlato 11/9/09 Ltr.") at 3–4.) Reisman separately contends that evidence of his 2004 conviction should be excluded under Federal Rule of Evidence 404(b) because it is not " 'sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge inference advocated by the [government],' " and " 'the length of time between the events . . . detract[s] from any potential probative value' of the prior acts." (Reisman 12/1/09 Ltr. at 3.)

The government first counters that the bulk of this "other schemes" evidence relating to Reisman is admissible against all defendants without reference to Rule 404(b) because the evidence constitutes

---

**29.** Federal Rule of Evidence 402 provides in relevant part that only relevant evidence is admissible. Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**30.** Graham's arguments in support of severance are discussed more fully *infra*, Section IV.

**31.** Notably, neither Reisman nor Kahale originally moved to exclude evidence of their own prior convictions. However, on December 1, 2009, nearly three months after receiving the government's 404(b) notice of its intent to introduce evidence of Reisman's prior conviction and without providing any explanation for the delay, Reisman belatedly moved to preclude such evidence. (*See* Gov. Reisman 404(b) Ltr.; *see also* Reisman 12/1/09 Ltr.) The court has again considered Reisman's arguments despite their tardiness.

"direct evidence of the crime charged in the indictment." (Gov. 8/26/09 Mem. at 18.) Alternatively, the government asserts that "other schemes" evidence is admissible pursuant to Federal Rule of Evidence 404(b) either to provide background information and enable the jury to "understand the complete story of the crime charged," (Gov. 8/26/09 Mem. at 24), or to show Reisman's knowledge and intent, the existence of a common scheme, and the absence of mistake (Gov. Reisman 404(b) Ltr. at 3; Gov. 12/4/09 Ltr. at 5–6.).

Further, the government alleges that both Reisman and Kahale's prior convictions constitute "direct evidence" of the charged crimes because the convictions form the basis for two of the charged misrepresentations in furtherance of the conspiracy. (*See* Gov. Reisman 404(b) Ltr. at 3; Gov. Kahale 404(b) Ltr. at 1; Gov. 12/4/09 Ltr.) Alternatively, the government declares that Reisman's prior conviction is also admissible as 404(b) evidence because the fraudulent scheme Reisman plead guilty to is "nearly identical to the scheme alleged in the indictment." (Gov. 12/4/09 Ltr. at 2.)

For the reasons that follow, evidence of the Philippine Islands Recovery Project, the CLH Loan Transaction, an unidentified victim known as V–4's involvement in the Crude Oil Deal, and evidence of Reisman and Kahale's prior convictions is admissible as to all defendants as direct evidence of the offenses charged pursuant to Federal Rules of Evidence 401 and 402. Evidence regarding Reisman's other business transactions with the first unidentified victim ("V–1"), specifically, Dinozine, the See It Live project, the Sugar Deal, and the Crude Oil Deal,[32] is inadmissible. Finally, the court denies as moot the mo-

tions to preclude introduction of evidence of the Congo Deal and the Able Income Fund.

### A. Legal Standards

#### 1. *Direct Other Act Evidence Under FRE 401 and 402*

Direct evidence of the crimes charged in the indictment is considered relevant and admissible without reference to Federal Rule of Evidence 404(b). *See, e.g., United States v. Towne,* 870 F.2d 880, 886 (2d Cir.1989), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989). "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Williams,* 585 F.3d 703, 707 (2d Cir.2009) (internal citation omitted). "Thus, evidence is often admissible to provide background for the events alleged in the indictment or to enable the jury to understand the complete story of the crimes charged." *Id.* at 707–08 (noting that "the prosecution is entitled to present a complete narrative of the crime that 'satisf[ies] jurors' expectations about what proper proof should be'") (quoting *Old Chief v. United States,* 519 U.S. 172, 188–89, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)). Evidence of uncharged criminal activity is relevant and admissible under Federal Rule of Evidence 402, without any reference to Federal Rule of Evidence 404(b) "if [the evidence] arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."

---

**32.** Evidence of the Crude Oil Deal is only inadmissible with respect to V–1. As noted, evidence of the Crude Oil deal in connection

with V–4 is admissible as direct evidence of the crimes charged.

*Towne,* 870 F.2d at 886 (internal citations and quotations omitted).

### 2. *Other Crimes Evidence Under FRE 404(b)*

 Alternatively, evidence of prior bad acts may be introduced under Rule 404(b) [33] "if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value, and (4) it is admitted with a limiting instruction if requested." *United States v. Rutkoske,* 506 F.3d 170, 176–77 (2d Cir. 2007) (citing *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). Courts of the Second Circuit have adopted an "inclusionary approach" [34] under Rule 404(b), admitting evidence of other crimes, wrongs or acts for "any purpose," *United States v. Inserra,* 34 F.3d 83, 89 (2d Cir.1994), "unless it is introduced for the sole purpose of showing defendant's bad character ... or unless it is overly prejudicial under Fed.R.Evid. 403 or not relevant under Fed.R.Evid. 402," *United States v. Pascarella,* 84 F.3d 61, 69 (2d Cir.1996) (internal citation omitted).

 In addition to the familiar purposes outlined in Rule 404(b) itself, proper purposes for which evidence may be admitted pursuant to Federal Rule of Evidence

404(b) include to: "(1) explain the development of the illegal relationship between participants in a conspiracy; (2) explain the mutual trust that existed between conspirators; or (3) complete the story of the crime charged." *United States v. Shaw,* No. S2–06–cr–41, 2008 WL 4899541, at *5, 2008 U.S. Dist. LEXIS 92333, at *14 (S.D.N.Y. Nov. 13, 2008) (citing *Inserra,* 34 F.3d at 89). A district court has broad discretion to admit evidence pursuant to Rule 404(b) and its ruling will not be overturned on appeal absent abuse of discretion. *See Inserra,* 34 F.3d at 89.

### B. Evidence Admissible Against All Defendants as Direct Other Act Evidence Under FRE 401 and 402

#### 1. *Philippine Islands Recovery Project*

The government characterizes the Philippine Islands Recovery Project as "part and parcel of the scheme charged in the indictment" and therefore "direct evidence of the charged offense" that does not require a 404(b) analysis. (Gov. 8/26/09 Mem. at 20.) Graham concedes that the "terms of the superseding indictment" supports this assertion. (*See* Graham 10/7/09 Mem. at 13.) [35] The court agrees.

 The Indictment alleges that the defendants engaged in a conspiracy where they solicited investors to invest in B.I.M.

---

33. Federal Rule of Evidence 404(b) provides, in relevant part:

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

34. "The exclusionary approach to similar act evidence obliges the trial court to determine whether the issue sought to be proved is among the traditional exceptions to the rule barring prior act evidence; the inclusionary

approach permits the evidence to be used to prove any issue other than propensity ..." *United States v. Figueroa,* 618 F.2d 934, 940 n. 2 (2d Cir.1980).

35. At a status conference on 12/2/09, counsel for Reisman acknowledged that the Superseding Indictment had mooted his argument that the government's introduction of evidence relating to the Philippine Islands Recovery Project would "violate due process by constructively amending the indictment, or, creating a prejudicial variance between the indictment and the proof adduced at trial." (*See* Reisman 9/3/09 Ltr. at 2.)

by falsely claiming that B.I.M. possessed mineral and precious metal assets around the globe and issued "gold delivery certificates" to the investors in exchange for their money. (Ind't ¶¶ 10–13.) Certainly, the Philippine Islands Recovery Project, for which defendants allegedly sought investors to invest money or loans in B.I.M. based on the allegedly false promise that the money would be used to recover gold from the Philippines and secured the investments with gold delivery certificates, comprises a part of the overall conspiracy alleged in the Indictment. Accordingly, evidence of the Philippine Islands Recovery Project is admissible as to all defendants as direct evidence of the crimes charged.

### 2. CLH Loan Transaction and V–4's Involvement in the Crude Oil Deal

 Similarly, the government alleges that the loan transactions involving the CLH Loan Transaction and V–4's involvement in the Crude Oil Deal constitute direct relevant evidence of the crimes charged. (Gov. 8/26/09 Mem. at 25.) According to the government, an unindicted co-conspirator ("UCC") represented to a victim ("V–4") that UCC operated a non-profit organization called CLH, which provided food and housing to the poor. (Id.) UCC allegedly further represented to V–4 that CLH needed money and convinced V–4 to become an officer of CLH in order to obtain a $50,000 loan on behalf of CLH. (Id.) UCC allegedly promised V–4 that the loaned money would in turn be invested in B.I.M., so that within 45 days V–4 would receive all his money back in addition to $25,000 profit. (Id.) In light of these promises, the government asserts that V–4

became an officer of CLH and secured a loan with his wife from HSBC which wired the loaned money directly to CLH's account and following which the money was wired to Reisman's account. (Id.)

According to the government, to memorialize this arrangement, V–4 signed a loan agreement with B.I.M. and the loan was secured with a B.I.M. gold delivery certificate. (Id.) When V–4 was unable to redeem the gold delivery certificate, the government asserts that Reisman, Kahale and Scarlato assured V–4 that the money would be repaid. (Id. at 26.) Finally, after V–4 threatened to report Reisman to the F.B.I., the government alleges that Reisman solicited and obtained an investor into the Crude Oil Deal and used those funds to repay V–4. (Id.)

Based on these proffers by the government, the CLH Loan Transaction is admissible as direct evidence of the charged offenses. If the government were to prove the facts alleged, V–4's having been convinced by members of the conspiracy to take out the loan through CLH in order to invest the money with B.I.M. comprises evidence relevant to the charged offenses.[36] Further, Reisman, Kahale, and Scarlato's efforts to assuage V–4's concerns upon his difficulty redeeming the gold delivery certificates also constitute overt acts of the conspiracy.

Similarly, the Crude Oil Deal in connection with V–4 is also admissible as direct evidence of the charged offense. The government alleges that defendant Reisman solicited money from an investor into the Crude Oil Deal in order to repay V–4, a disgruntled investor in the B.I.M. scheme, and to avoid V–4's reporting the alleged

**36.** To the extent Reisman argues that the CLH Transaction has "no relevance to the charges in the indictment" because V–4's loan was repaid in full, this argument lacks merit for the reasons stated above. (*See* Reisman 9/3/09 Ltr. at 2) (discussing, without specifying a "loan … that was later repaid in full").)

fraud to authorities. As an act taken to conceal an ongoing illegal agreement, it constitutes an act in furtherance of the charged conspiracy, and is admissible. *See United States v. Mermelstein,* 487 F.Supp.2d 242, 261 (E.D.N.Y.2007) ("Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it.") (citing *United States v. Milstein,* 401 F.3d 53, 72 (2d Cir.2005)). Accordingly, evidence of V–4's connections to both the CLH Loan Transaction and the Crude Oil Deal are admissible against all defendants as direct evidence of the offenses charged.

### 3. *Evidence of Reisman and Kahale's Prior Convictions*

■ Evidence of both Reisman and Kahale's prior convictions also constitutes direct evidence of the crimes charged and is therefore admissible pursuant to Federal Rule of Evidence 402. The Indictment alleges that the defendants misrepresented their backgrounds, (Ind't ¶ 12), and the government has proffered that those misrepresentations included the falsehood that Kahale was a retired General in the United States military and that Reisman was a C.P.A. (Gov. 10/23/09 Mem. at 6.) Because evidence of these prior convictions is directly relevant to the charged misrepresentations as discussed above, the evidence is admissible against all defendants pursuant to Federal Rule of Evidence 402.[37]

### C. **Remaining Other Business Venture Evidence Inadmissible**

■ The government has noticed its intention to introduce additional evidence related to some other business activities conducted by Reisman. Specifically, in connection with the testimony of the first unidentified witness, ("V–1"), the government has indicated its intention to offer evidence of V–1's other investments with Reisman between 2000 and May 2005, including the proposed Dinozine magazine, the See It Live project, the Sugar Deal, and the Crude Oil Deal ("V–1 Transactions"). (Gov. 8/26/09 Mem. at 20–25.) The government declares that evidence of the V–1 Transactions is inextricably intertwined with the evidence regarding the charged offense, or necessary to complete the story of the crime on trial, because these other investments explain the origins and continuing relationship between Reisman and V–1. (*Id.* at 20–24.) Alternatively, the government claims that this evidence should be admitted as "other crimes" evidence pursuant to 404(b). (*Id.* at 24–25.)

Reisman first notes that the government "assumes without elaborating" that these other business ventures were fraudulent and asserts that this conclusion is "pure speculation." (Reisman 12/1/09 Ltr. at 5.) In this context, Reisman contends that evidence of Reisman's other business ventures with V–1 is "not necessary to complete the story of the crime on trial," not offered for a proper purpose, not relevant, and instead will "necessarily result in multiple trials within a trial as Mr. Reisman is forced to defend the legitimacy of these [other] projects." (Reisman 9/3/09 Ltr. at 1–2; Reisman 12/1/09 Ltr. at 5–6.)

Evidence of these deals between Reisman and V–1 does not constitute direct evidence of the conspiracy charged in the Indictment. For example, the Dinozine magazine project originated in 2000, years before Reisman ever met Kahale or was introduced to the B.I.M. investment scheme. (*See* Reisman 9/3/09 Ltr. at 1.)

---

37. Accordingly, the court declines to address Reisman's additional arguments regarding the inadmissibility of the prior conviction under Rule 404(b). (*See* Reisman 12/1/09 Ltr. at 1–3.)

As such, Dinozine necessarily does not arise "out of the same transaction or series of transactions as the charged offense." *See Towne,* 870 F.2d at 886. Likewise, V–1's investments in See It Live, the Sugar Deal, and the Crude Oil Deal,[38] while certainly indicative of some type of ongoing relationship between Reisman and V–1, is by no means inextricably intertwined with V–1's investments involving B.I.M. In fact, even a cursory examination of the timing and circumstances surrounding these other business dealings reveals that these dealings were just that—other, discrete and distinct business deals. Therefore, evidence of the other V–1 Transactions "is not necessary to complete the story of the crime on trial" and is inadmissible as direct evidence of the crimes charged. *See id.*

This evidence is also inadmissible under Federal Rule of Evidence 404(b). While the government intends to offer this other act evidence for an admittedly proper purpose—namely, to show knowledge, intent, and lack of mistake or accident, (*see* Gov. Reisman 404(b) Ltr. at 3), this does not end the inquiry. *See United States v. Gordon,* 987 F.2d 902, 908 (2d Cir.1993). Rather, the court must also determine whether the proffered evidence is relevant to that proper purpose under Federal Rules of Evidence 401 and 402, and if so, whether that probative value is substantially outweighed by any risk of unfair prejudice under Federal Rule of Evidence 403. *See id.* Here, the government fails to overcome both of these hurdles.

▌ First, because the government fails to demonstrate that the other-act evidence "provide[s] a reasonable basis for inferring knowledge," its offer of the evidence for that purpose must be "rejected on grounds of relevance." *See id.* Indeed, the relevance of the other-act evidence turns on the existence of a "close parallel" between that other act evidence and the charged conduct. *Id.* No such parallel exists here. None of the V–1 Transactions concerned B.I.M., gold delivery certificates, gold, or any other precious minerals or metals. The fact that the other transactions involved the same alleged victim, that no return has yet materialized on the investments, and that two of the dealings involved "venture[s] based purportedly outside the United States" are connections far too tenuous to satisfy the relevance standards outlined in *Gordon,* 987 F.2d at 908 (noting that it is "an abuse of discretion for the trial court to admit other-act evidence if the other act or acts are not sufficiently similar to the conduct at issue").

Moreover, there is no evidence that the other V–1 Transactions were fraudulent or illegal, and accordingly those other transactions cannot "logically show" Reisman's knowledge. *See id.* at 908–09 (discussing *United States v. Afjehei,* 869 F.2d 670, 674 (2d Cir.1989), which rejected other act evidence of a defendant's prior trips abroad to show knowledge under 404(b) "since the government had not shown that the prior trips involved narcotics, [and therefore] those trips could not logically show that [the defendant] knew the bag with which he was arrested contained narcotics").

▌ Second, any probative value that could be attached to this evidence is substantially outweighed by the risk of unfair prejudice under Federal Rule of Evidence 403. Additionally, Reisman's fear that introduction of such evidence will lead to multiple "mini-trials" within the trial is

---

**38.** As noted above, the Crude Oil Deal is admissible with respect to V–4 and the CLH

Loan Transaction.

well-founded. (*See* Reisman 12/1/09 Ltr. at 5–6.) Reisman's anticipated efforts to defend the legitimacy of these other V–1 Transactions will necessarily result in delay, confusion of the issues, and may mislead the jury to make a determination of guilt based on propensity. *See, e.g., United States v. Figueroa*, 618 F.2d 934, 942 (2d Cir.1980). Thus, there is a significant risk that introduction of this evidence could "undermine the fairness of the trial" with "classic, and powerful, evidence of propensity." *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir.2009).

Accordingly, the motion to prelude evidence of Reisman's other V–1 Transactions,[39] specifically, Dinozine, See It Live, the Sugar Deal, and V–1's involvement in the Crude Oil Deal, is granted and such evidence is inadmissible.

### D. Denying as Moot Motions to Preclude Evidence of the Congo Deal and Able Income Fund LLC

The government has stated that it does not expect to introduce evidence of the Congo Deal or loan transactions involving the Able Income Fund LLC as part of its case-in-chief. (Gov. 8/26/09 Mem. at 26.) As a result, the court denies the motions to preclude the evidence of these ventures as moot.

### IV. Motions to Sever Trial or Alternatively to Exclude Co–Defendant Statements in Any Joint Trial

Essentially, the defendants each seek separate trials, or, in the alternative, the exclusion at any joint trial of certain statements by co-defendants. Reisman seeks to sever his trial from that of his co-defendants on grounds that: (1) introduction of co-defendant statements would violate his rights under the Confrontation Clause of the Sixth Amendment; and (2) the volume of evidence against Reisman's co-defendants as compared to the paucity of evidence against Reisman would cause "spillover prejudice." (Reisman 8/5/09 Mem. at 11–13.) Graham separately moves to sever trial also because of the Confrontation Clause concerns raised by the potential introduction of co-defendant statements, (Doc. No. 69, Ltr. from Jeremy Gutman dated 10/28/09), as well as the potential for spill-over prejudice from evidence of the uncharged prior acts and prior criminal history of Reisman, (Graham 10/7/09 Mem. at 12–18). As the government notes, each defendant has also joined in the motions of all the others, so that it appears that each defendant seeks a separate trial.[40] In the alternative, and assuming *arguendo* that the court declines to sever trial, the defendants raise arguments—discussed more fully below—to support their contention that the co-defendant statements should be excluded in any joint trial.

The government opposes the motions to sever trial and to exclude the co-defendant statements. (*See* Gov. 8/26/09 Mem. at 27–33; Gov. 10/23/09 Mem. at 24–29.) The government first notes the powerful policy reasons behind jointly trying defendants who were indicted together, second, pro-

---

**39.** Again, evidence regarding V–1's investments in B.I.M. and the Philippine Island Recovery Project is admissible as to all defendants as direct evidence of the crimes charged, as discussed *supra* Section III.B.1. Further, evidence of the Crude Oil Deal in connection with V–4's investments, as discussed *supra* Section III.B.2, is also admissible as direct evidence of the crimes charged.

**40.** As noted previously, Scarlato and Kahale submitted various letters joining in the substantive motions of Reisman and Graham. In addition, both Reisman and Graham joined in the motions of the other to the extent applicable. (*See* Reisman 11/9/09 Ltr.; Doc. No. 63, Graham Notice of Mot. at 1.)

poses a combination of redactions or selective excerpts in order to cure Confrontation Clause issues, and third, asserts that no improper spillover will occur where the majority of the evidence complained of would also be admissible in separate trials and where there is no constitutional bar to trying defendants who face disparate quanta of proof. (*See generally* Gov. 8/26/09 Mem. at 27–33; Gov. 10/23/09 Mem. at 24–29; Gov. 11/24/09 Stmts. Ltr.; Doc. No. 102, Ltr. from Tanya Hill and Jonathan Green dated 12/8/09 ("Gov. 12/8/09 Stmts. Ltr.").)

For the reasons that follow, the court finds that severance is not required based on Confrontation Clause concerns or warranted by any asserted risk of improper prejudicial spillover. The court therefore declines to exercise its discretion to sever trial based on these concerns and denies defendants' motions to do so.

### A. Standard

 "There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials ... promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' " *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (internal quotation omitted); *see also Richardson v. Marsh,* 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."). "This preference is particularly strong where, as here, participants are alleged to have participated in a common scheme or plan." *United States v. Salameh,* 152 F.3d 88, 115 (2d Cir.1998) (per curiam).

 Indeed, where joinder is proper,[41] a court "should grant a severance under Rule 14[42] only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Thus, a defendant seeking severance "must show prejudice so severe as to amount to denial of a constitutional fair trial." *United States v. Spinelli,* 352 F.3d 48, 54 (2d Cir.2003) (citations omitted). Yet, the possibility of prejudice alone does not necessarily mandate severance pursuant to Rule 14. *See Zafiro,* 506 U.S. at 538–39, 113 S.Ct. 933. Rather, Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.*

### B. Severance on the Basis of Confrontation Clause Concerns

Defendants assert that introduction of their co-defendants' statements will violate their specific trial rights under the Confrontation Clause. Defendants therefore demand severance into separate trials, or in the alternative, exclusion of the co-defendants' statements at a joint trial. For

---

**41.** Pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure, joinder is appropriate where defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

**42.** Rule 14(a) of the Federal Rules of Criminal Procedure provides, in relevant part, that, if a joint trial "appears to prejudice a defendant[,] ... the court may ... sever the defendants' trials, or provide any other relief that justice requires."

the reasons that follow, the requests to sever trial are denied, and the requests to exclude certain co-defendant statements are denied in part, and granted in part.

### 1. *Confrontation Clause and Bruton Concerns*

■ The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "The crux of this right is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination." *Ryan v. Miller*, 303 F.3d 231, 247 (2d Cir.2002). The Supreme Court has recognized, however, that in a multi-defendant trial, where an accusatory statement is admissible as to one defendant but not others, courts can often employ a proper limiting instruction to eliminate any Confrontation Clause concerns arising as to the other defendants, and can trust jurors to abide by such an instruction. *See, e.g., Marsh*, 481 U.S. at 207, 107 S.Ct. 1702 (noting that the law "almost invariably assumes that jurors follow such limiting instructions") (collecting cases).

However, there is a critical limitation on this routine presumption of faith in the jury's abilities to follow limiting instructions. In *Bruton v. United States*, the Supreme Court recognized that introduction at a joint trial of "the powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side by side with the defendant" creates an untenable "risk that the jury will not, or cannot, follow instructions" to limit its consideration of the evidence only against the declarant. 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Accordingly, *Bruton* held that when a non-testifying co-defendant's statements specifically inculpating a defendant are introduced at a joint trial, courts "cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right to cross-examination." *Id.* at 135–37, 88 S.Ct. 1620.

Unable to rely on a limiting instruction alone, in order to cure a *Bruton* problem courts generally have three options: (1) careful redactions which eliminate the references to co-defendants; (2) severance; or (3) exclusion of the confession at a joint trial. *See generally United States v. Jass*, 569 F.3d 47, 55–56 (2d Cir.2009).

When employing redaction to avoid *Bruton* concerns, the Second Circuit recognizes two acceptable types of redactions: (1) redactions eliminating altogether any reference to a co-defendant's existence; and (2) redactions replacing a co-defendant's name with neutral pronouns so that the statement, standing alone, does not refer to the co-defendant. *See id.* (citing *Marsh*, 481 U.S. at 211, 107 S.Ct. 1702) (noting that *Bruton* concerns are alleviated where a limiting instruction is coupled with the admission of co-defendant statements which have been redacted "to eliminate not only the defendant's name, but any reference to his or her existence" and which are only inferentially incriminating to co-defendants "when linked with other evidence introduced at trial"); *see also Jass*, 569 F.3d at 56 (citing *United States v. Tutino*, 883 F.2d 1125, 1135 (2d Cir.1989)) (holding that "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's *Bruton* rights").

The Second Circuit has made clear, however, that it is always preferable to use the first method of redaction so as "to eliminate completely from a confession any mention of a non-declarant defendant's existence." *Jass*, 569 F.3d at 56 n. 5. Thus, the second method of redaction, which employs neutral pronouns, should be employed "only" as a last resort, "when complete redaction would distort the confession ... or chang[e] the tenor of the utterance as a whole." *Id.* (internal citation and quotation omitted). Moreover, the Supreme Court has warned that clumsy redactions which "simply replace a name with an obvious blank space or word such as 'deleted' or ... other similarly obvious indications of alteration" do not suffice to eliminate *Bruton* concerns and in fact, "so closely resemble *Bruton's* unredacted statements" that the law requires the same result. *Gray v. Maryland*, 523 U.S. 185, 192, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998).

When courts do employ redactions involving neutral pronouns, the Second Circuit instructs that the propriety of the redactions should be analyzed with reference to two questions: "(1) did the redacted statement give any 'indication to the jury that the original statement contained actual names,' and (2) did the 'statement standing alone ... otherwise connect co-defendants to the crime.' " *Jass*, 569 F.3d at 58 (citing *Tutino*, 883 F.2d at 1135). Thus, in analyzing these issues, a court reviewing the admissibility of a redacted statement which employs neutral pronouns must "view the confession in isolation from the other evidence" in order to insure that "the confession, when so viewed, does not incriminate the defendant." *United States*

*v. Williams*, 936 F.2d 698, 700–01 (2d Cir. 1991). If a redacted statement utilizing neutral pronouns passes this test, "it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to defendant." *Id.*

### 2. *Application*

██ Defendants assert that severance or exclusion of the co-defendant statements are the only solutions to the potential *Bruton* concerns arising from the proposed introduction of their co-defendants' statements. *See, e.g., Jass*, 569 F.3d at 56 n. 5 ("In circumstances where a court concludes that no redaction can overcome [the] probability [that a jury will be unable to follow a limiting instruction], only two options are available: severance or exclusion of the confession at a joint trial.") Having reviewed the deposition testimony and the 302 Statements in their entirety, and specifically the highlighted and redacted portions of those statements which the government has represented it intends to offer in its case-in-chief,[43] the court disagrees.

Indeed, in this case, the careful excerpts and redactions proposed by the government easily "overcome the probability," if any, that a jury would be unable to follow a limiting instruction. *See id.* As an initial matter, the court notes that none of the excerpts from the depositions and 302 Statements that the government intends to offer include references by a defendant to any co-defendant. (*See* Gov. 11/24/09 Stmts. Ltr. and Exs. A–F.) Rather, the statements the government proposes to introduce as part of its case-in-chief are

---

**43.** The court considers for this purpose the highlighted portions in the government's November 24, 2009 letter, as amended by the government's December 8, 2009 letter, which proposes an additional redaction to eliminate the reference to defendant Harold Kahale on page 2 of the February 5, 2008 FBI 302 (bates number 14). (*See* Gov. 11/24/09 Stmts. Ltr; *see also* Gov. 12/8/09 Stmts. Ltr.)

primarily statements in which the co-defendants provide background information about B.I.M. and its operations without referencing—or inculpating—any other co-defendant. (*See id.*; *see also* Gov. 12/8/09 Stmts. Ltr.) Such statements belong to the first class of redacted statements which altogether eliminate any reference to the co-defendants. *See Jass*, 569 F.3d at 56. The use of such statements at a joint trial is constitutionally permissible and successfully avoids Confrontation Clause issues. *See, e.g., Richardson*, 481 U.S. at 211, 107 S.Ct. 1702 ("the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence").

Based on this clear Supreme Court precedent, the court finds that there is no basis to conclude that a jury will be unable to follow an appropriate limiting instruction or that the introduction of the proposed statements will result in violation of the defendants' Confrontation Clause rights. Therefore, severance is not required on the basis of Confrontation Clause concerns.

## C. Admissibility of Co–Defendant Statements in a Joint Trial

In the event the court declined to sever trial, the defendants have raised a host of arguments as to why the co-defendant statements should be excluded in any joint trial. As noted, the government opposes the motions to exclude the co-defendant statements and proposes to employ selective excerpting along with limited redactions so as to avoid Confrontation Clause concerns while enabling the admission of the statements.

Defendants counter that even the use of excerpted statements [44] cannot cure the Confrontation Clause concerns because, first, the government's proposed introduction of the statements of a defense attorney made during the co-defendants' depositions [45] in the civil case raises relevancy and other issues, (Scarlato 12/1/09 Ltr. at 2), and second, "any effort by one defendant to balance the government's selections can be thwarted by another defendant's *Bruton* rights" (Scarlato 12/1/09 Ltr. at 1.).[46] Each of these concerns is discussed below.

**44.** Previously, the defendants had argued forcefully against the use of redactions employing neutral pronouns on the grounds that that such redactions would prejudice the defendants by either distorting the testimony and creating negative credibility inferences about the declarants, (Scarlato 11/9/09 Ltr.), or creating a risk that the jury would improperly (and incorrectly) speculate that the "someone else" neutrally referred to in the transcript was one defendant when, in fact, it was not, (Reisman 11/9/09 Ltr.). Defendants concede that these arguments have effectively been mooted by the government's proposed use of limited excerpts which do not employ neutral pronouns and eliminate any references to other defendants altogether. (*See* Doc. No. 94, Ltr. from Jan Rostal on behalf of Kahale, Graham, Reisman and Scarlato dated 12/1/09 "Scarlato 12/1/09 Ltr.") (noting that the selection of statements that do not require

the use of neutral pronouns "solves half the problem" before embarking on rule of completeness arguments).

**45.** Again, only the defendants in the civil case—Kahale, Graham and Scarlato—("civil defendants"), gave deposition testimony or made 302 Statements.

**46.** Defendants additionally argued that "notwithstanding limiting instructions, the jury will consider the [co-defendant statements] in their entirety as evidence in support of a fundamental component of the government's burden of proof" against the other defendants. (Doc. No. 69, Ltr. from Jeremy Gutman on behalf of Graham dated 10/28/09.) However, as discussed *supra*, Section IV.B.2, the court has taken notice that statements selected by the government for inclusion in

### 1. *Deposition Statements by Non–Defendant Attorney*

First, the motion to exclude the selected portions of the deposition transcripts is granted with respect to the statements made by the defense attorney, Edward A. Platzik, Esq., ("Platzik"), who ostensibly appeared on behalf of Kahale, Graham and Scarlato during the depositions in the civil trial. The government seeks to introduce Platzik's statements during the deposition that he "acknowledges" the requests by the opposing counsel for production of documents. (*See* Gov. 11/24/09 Stmts. Ltr. Exs. A–F.) Defendants assert that introduction of Platzik's statements would raise an array of issues related to the propriety of Platzik's representation of the civil defendants, particularly Scarlato, the extent of his agency relationship with the civil defendants, and relevancy. Because the statements are minimally probative at best, and acknowledging without deciding the additional issues raised with respect to these statements, any statements by Platzik during the co-defendant depositions shall be inadmissible.

### 2. *Rule of Completeness*

Next, the defendants make a broad, conclusory assertion that any proposed redactions cannot cure the Confrontation Clause concerns because "any effort by one defendant to balance the government's selections can be thwarted by another defendant's *Bruton* rights." (Scarlato 12/1/09 Ltr. at 1.). Defendants rely on the "rule of completeness" embodied in

Federal Rule of Evidence 106,[47] which requires that an "omitted portion of a statement must be placed in evidence if necessary to explain the omitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir.1987), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). Federal Rule of Evidence 106 is violated "only where an admission of the statement in redacted form distorts its meaning or excludes information that is substantially exculpatory of the defendant." *United States v. Alvarado*, 882 F.2d 645, 651 (2d Cir.1989). Courts evaluating claims under this Rule must "balance the interest in protecting a co-defendant's confrontation right against the judicial economy promoted by conducting a joint trial." *United States v. Mussaleen*, 35 F.3d 692, 696 (2d Cir.1994) (citing *Castro*, 813 F.2d at 576).

Here, despite ominous warnings about constitutional violations, and with the exception of Graham, defendants do not identify a single portion of the transcripts which, if omitted, will "distort the meaning" of the statements or exclude "substantially exculpatory" information. *See Alvarado*, 882 F.2d at 651. Such vague, conclusory assertions simply cannot be a basis for either severance or exclusion of the statements.

Graham identifies three specific portions of testimony which he asserts ought to be admitted pursuant to Federal Rule of Evi-

---

their case in chief do not directly inculpate the declarants, much less any unmentioned and unknown "other" or any co-defendant. In fact, the statements are generally of a background nature, obviating defendants' concern, and do not reference other co-defendants.

**47.** Federal Rule of Evidence 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *Id.*

dence 106. (*See* Doc. No. 95, Ltr. from Jeremy Gutman on behalf of Graham dated 12/1/09 ("Graham 12/1/09 Ltr.").) The first portion Graham moves to admit, page 5, lines 5–6, is already highlighted for inclusion by the government, and therefore moot. (*See* Gov. 11/24/09 Stmts. Ltr. Ex. B.) The second portion Graham moves to admit, page 6, lines 17–19, appears to be the middle of a sentence. (*See* Graham 12/1/09 Ltr.; *see also* Gov. 11/24/09 Stmts. Ltr. Ex. B.) Assuming Graham intends to seek admission of the entire answer containing that sentence on page 6, the court finds that page 6, lines 15–19 are admissible pursuant to Federal Rule of Evidence 106, using the previously proposed redaction in order to strike the words "Mr. Kahale and his field team do the work of". Finally, Graham seeks to introduce page 31, lines 9–15. (*See* Graham 12/1/09 Ltr.) Because this section of text includes references to other co-defendants, the court must balance the right to confrontation of those co-defendants against the interest in a joint trial. Here, these competing interests can be resolved by admitting page 31, lines 9–11, and substituting the neutral pronoun "others" for the words "the team" in line 11. *See, e.g., Castro,* 813 F.2d at 576–77 (noting that district court "reasonably accommodated these competing interests" of co-defendants in a joint trial by allowing attorneys to elicit testimony which conveyed "the gist of [the defendant's] statement ... without unduly prej-

udicing either" the co-defendant's right to confrontation or the defendant's right to have his statement presented in context.)

Accordingly, the highlighted portions of the co-defendants' statements, (*see* Gov. 11/24/09 Stmts. Ltr. Exs. A–F), excluding the statements of Platzik, are admissible. Furthermore, the additional portions identified by Graham as necessary to explain the context of the remarks are also admissible, as detailed above, pursuant to Federal Rule of Evidence 106.

**D. Severance on the Basis of Spillover Prejudice**

Defendants further argue that severance is required due to the potential for improper spillover prejudice from the other defendants. Reisman argues that his trial should be severed because of prejudice created "by the sheer volume of evidence against [his] codefendants, which dwarfs the scant evidence of Reisman's alleged participation in the fraud alleged in the indictment." (Reisman 8/5/09 Mem. at 12.)[48] Graham, Kahale, and Scarlato conversely argue that a severance is warranted because of the "overwhelming array of evidence concerning prior criminal history and uncharged acts that were allegedly perpetrated by co-defendant Mitchell Reisman" alone. (Graham 10/7/09 Mem. at 12.)[49] Neither party has presented adequate grounds to warrant severance on the basis of prejudicial spillover.

---

**48.** Reisman claims the evidence against his co-defendants is stronger because Kahale and Graham were: (1) officers of B.I.M. and thus intimately involved and familiar with all of its financial dealings; (2) signatories of the "gold delivery certificates"; (3) the drafters of the many letters to B.I.M.'s investors advising them of delays and urging patience; and (4) in full possession of all the information relevant to B.I.M.'s actual assets and contractual prospects and related ability to meet investors' expectations. (Reisman 8/5/09 Mem. at

12.) The government disputes Reisman's assessment of the volume of evidence against him vis-a-vis his codefendants, but argues that severance would not be warranted even if that were the case. (Gov. 8/26/09 Mem. at 31.)

**49.** Graham refers to the evidence of Reisman's other business ventures, discussed in Section III, *supra,* along with evidence of Reisman's 2003 conviction in New Jersey for theft by deception and securities fraud.

### 1. Standards for Severance on the Basis of Spillover

 "It is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540, 113 S.Ct. 933. Indeed, "[r]ules 8(b) and 14 are designed to promote efficiency and to avoid a multiplicity of trials [so long as] these objectives can be achieved without substantial prejudice to the right of the defendant to a fair trial." *Id.* (internal citation and quotation omitted). Thus, in order to prevail on a motion for severance, the defendant carries the "heavy burden" of showing "not simply some prejudice but *substantial* prejudice." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir.2004) (emphasis in original). Substantial prejudice may be found where evidence admissible against the jointly-tried co-defendants "in some way affected the jury's ability fairly and rationally to evaluate the evidence of ... guilt" *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir.1996).

### 2. Application

 Here, defendants fail to meet their "heavy burden" of showing substantial prejudice and their "general, unsupported claim[s] of prejudice" are "insufficient to warrant the severance of ... properly joined" trials. *Feola*, 651 F.Supp. at 1122 (internal quotation omitted).

 First, spillover prejudice from the comparatively greater volume of evidence implicating a co-defendant is relevant only where that evidence could not be admitted if the defendant were to have been tried separately. *See United States v. Miller*, 116 F.3d 641, 679 (2d Cir.1997) ("Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have

been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial ....") (internal citation omitted); *see also Salameh*, 152 F.3d at 115 (spillover prejudice is less likely in cases where defendants are charged in same conspiracy). Thus, here, there is no risk of prejudice where much of the evidence pointed to by defendants would be admissible in separate trials against each defendant, as explained *supra* Section III.B, because evidence of "the full nature and scope of a conspiracy is admissible even at the trial of lesser participants." *United States v. Rahman*, 854 F.Supp. 254, 264 (S.D.N.Y.1994) (internal citations omitted); *see also United States v. Amato*, 540 F.3d 153, 164 (2d Cir.2008) (denying severance where the bulk of the evidence "could have been introduced against [the defendant] even had he been tried alone, since it was probative of the extent to which he was involved in the conspiracy"). Moreover, the remainder of the evidence complained of has been excluded pursuant to Federal Rule of Evidence 404(b). (*See supra* Section III.C.)

 Second, to the extent that there exists some greater quantum of proof implicating one defendant compared to another, this fact does not alone justify severance, for "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'" *Scarpa*, 913 F.2d at 1015 (internal quotation omitted); *see also United States v. Locascio*, 6 F.3d 924, 947 (2d Cir.1993) ("joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible."). Moreover, there is no reason to believe that a cautionary instruction here will be unable to cure any prejudice that might conceivably accrue to any one defendant from a joint trial. *See, e.g., Richardson*, 481 U.S. at 211, 107 S.Ct.

1702 ("juries are presumed to follow their instructions").

Accordingly, the motions to sever trial on the basis of either Confrontation Clause concerns or prejudicial spillover are denied, and the motions to exclude the co-defendant statements are denied in part, and granted in part, as detailed above.

## V. Expert Disclosure

Defendants request disclosure of the name and address of each expert witness which the government intends to call, along with a summary of his or her anticipated testimony, and the reports, studies, or other data on which such expert testimony will rely. Federal Rule of Criminal Procedure 16(a)(1)(G) provides:

> Expert witnesses.—At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.... The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

The government stated previously that it will "promptly disclose" to the defense information required under this Rule. (Gov. 8/26/09 Mem. at 33.) In light of this representation, the motion to compel disclosure of the government's expert witnesses is denied as moot but without prejudice. Defendants are invited to renew their motion for disclosure under Federal Rule of Criminal Procedure 16(a)(1)(G) if they are not satisfied by the government's response by January 7, 2010.

## CONCLUSION

For the reasons set forth above: (1) The motions for bills of particulars are granted in part and denied in part. The motion for a bill of particulars regarding unindicted co-conspirators is granted, and the government is directed to provide particulars regarding the names of any unindicted co-conspirators by December 30, 2009. The motions for bills of particulars are otherwise denied.(2) The motion to strike paragraph 12 of the Indictment is denied. (3) The motions to preclude introduction of evidence are: (a) denied with respect to evidence of the Philippine Islands Recovery Project, the CLH Loan Transaction, and V–4's connection to the Crude Oil Deal; (b) denied with respect to evidence of Kahale's and Reisman's respective prior convictions; (c) denied as moot with respect to the Congo Deal and the Able Income Fund LLC given the government's stated intention not to introduce this evidence; and (d) otherwise granted with respect to evidence of Reisman's other business ventures. Thus, evidence of Reisman's other business dealings with V–1, including Dinozine, the See It Live project, the Sugar Deal, and V–1's involvement in the Crude Oil Deal, is inadmissible. (4) The motions to sever trial are denied. (5) The motions to exclude the co-defendant statements are denied in part and granted in part. Excluding the statements of Attorney Platzik, the highlighted portions of the co-defendants' statements previously identified, (*see* Gov. 11/24/09 Stmts. Ltr. Exs. A–F, Gov. 12/8/09 Stmts. Ltr.), are admissible, along with the additional portions of testimony identified by Graham and as amended *supra* Section IV.C.2. (6) The motion to direct the government to disclose its experts under Federal Rule of Criminal Procedure 16(a)(1)(G) is denied as moot, with leave to renew if defendants are unsatisfied with the government's response by January 7, 2010.

**SO ORDERED.**